# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. _____

SERINA MINELLA;
MELANIE ANN SHELTON, parent of Jeremy Warren Patscheck, and Personal Representative of the Estate of Jeremy Warren Patscheck, deceased;
DAVID PATSCHECK, parent of Jeremy Warren Patscheck, deceased.

      Plaintiffs,

v.

CITY OF NORTHGLENN, a Colorado municipal corporation;
JAMES GARDNER, in his individual capacity;
NATHAN GALLUZZO, in his individual capacity;
ZACHERY SCHIEFERECKE, in his individual capacity;
EMIL CZERNICKI, in his individual capacity;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their counsel, BEEM & ISLEY, P.C., and BAUMGARTNER LAW, L.L.C., respectfully submit this Complaint against the Defendants and allege and aver as follows:

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. §1983, §1988, the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331 (federal question), §1343(a)(3) and (4) (civil rights), and the aforementioned statutory and constitutional provisions.

2.     Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts, and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.     Plaintiff, Serina Minella ("Serina"), is and was at all relevant times a citizen of the State of Colorado, residing in Adams County, Colorado.

4.     Plaintiff, Melanie Ann Shelton ("Shelton"), is and was at all relevant times a citizen of the State of Colorado, currently residing in Lochbuie, Colorado.  Plaintiff Shelton is the mother of Jeremy Warren Patscheck ("Jeremy"), deceased, and the duly appointed personal representative of his estate, Adams County District Court, 2018PR30815.

5.     Plaintiff, David Patscheck, is and was at all relevant times a citizen of the State of Colorado, residing in Arvada, Colorado.  Plaintiff David Patscheck is the father of Jeremy.

6.     Defendant, City of Northglenn ("Northglenn"), is and was at all relevant times a Colorado municipal corporation located in Adams County, Colorado, with final policy-making authority over its police officers, specifically including the individual Defendants named herein.

7.     Defendant, James Gardner ("Sergeant Gardner"), is or was at all times relevant a citizen of the State of Colorado, employed as a police officer with the rank of Sergeant for Northglenn in Adams County, Colorado, and acting within the course and scope of his employment under color of state law.

8.     Defendant, Nathan Galluzzo ("Officer Galluzzo"), is or was at all relevant times a citizen of the State of Colorado, employed as a police officer for Northglenn in Adams County, Colorado, and acting within the course and scope of his employment under color of state law.

9. Defendant, Zachery Schieferecke ("Officer Schieferecke"), is or was at all relevant times a citizen of the State of Colorado, employed as a police officer for Northglenn in Adams County, Colorado, and acting within the course and scope of his employment under color of state law.

10. Defendant, Emil Czernicki ("Officer Czernicki"), is or was at all relevant times a citizen of the State of Colorado, and employed as a police officer for Northglenn in Adams County, Colorado, and acting within the course and scope of his employment under color of state law.

## GENERAL ALLEGATIONS

11. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

12. In the early morning hours of December 13, 2017, Jeremy Patscheck and Serina Minella were sitting in a parked Honda Accord (the "Honda") with the engine off in the driveway of a home at 10445 Franklin Way in Northglenn, Colorado, waiting for a friend.

13. Jeremy was in the driver's seat of the Honda, and Serina was in the front passenger's seat.

14. A friend had loaned the Honda to Jeremy and Serina, but upon information and belief, someone had reported the Honda as being stolen.

15. At some point, law enforcement officers had attached a tracking device to the Honda, and they had been virtually tracking the movement and location of the Honda, as well as physically following it, for several hours while Jeremy and Serina were occupying it, both before and after it stopped and parked in the driveway of the Franklin Way home.

3

16.    Officers who were physically following and directly observing the parked Honda reported that there were two occupants in the Honda, that it was shut-off and parked in the driveway close to the garage door, and that the occupants were possibly sleeping in the Honda.

17.    While Jeremy and Serina were sitting in the enclosed parked Honda, at least seven (7) Northglenn officers arrived at the scene in multiple vehicles.

18.    Officers from the Colorado State Patrol, Colorado-Metropolitan Auto Theft Task Force ("C-MATT"), and possibly other law enforcement agencies were also at or near the scene.

19.    Sergeant Gardner arrived at the scene driving a large Chevrolet Tahoe SUV that he used to physically bump into the Honda to block it from behind in the driveway of the house. Defendants Galluzzo, Schieferecke, and Czernicki (collectively referred to as the "Shooting Officers") were riding with Sergeant Gardner in the SUV.

20.    The Honda was blocked or impeded from escape on all sides. It was blocked to the left (driver's side) by the house at 10445 Franklin Way. It was blocked in front by the garage of the house. It was blocked to the right (passenger's side) by the neighboring property owner's fence and further impeded on the right by a sharp drop-off of the concrete driveway. It was blocked from behind by the large SUV that had physically bumped the Honda and blocked the driveway to the street.

21.    Attached hereto as Exhibit 1 are two photographs of the scene of the incident—one aerial view and one at ground level--showing the location of the Honda in which Jeremy and Serina were sitting, the SUV, and the surrounding structures and obstacles.

22.    Furthermore, other officers in other vehicles had fanned out on both sides of the driveway for additional cover and in the event that the occupants of the Honda should try to flee.

4

23.     Upon arriving on the scene, the three Shooting Officers exited the SUV, approached the pinned Honda from both sides, and almost immediately fired multiple rapid gunshots at Jeremy and Serina who were still sitting inside the enclosed, pinned Honda.

24.     What happened in the intervening moments between the officers' arrival at the scene and the shooting is disputed.

25.     According to the Shooting Officers, one or more of them shouted commands, such as "Police, don't move," and/or "Police, show us your hands," immediately before they started firing their guns.

26.     According to other witnesses, no officer commands were heard—only the sounds of gunfire.

27.     Additionally, Serina has stated that no commands were given before she was shot.

28.     The Honda remained in the confined area of the driveway of the home at all times immediately prior to the shooting, and there was never any police chase of the Honda or of either Jeremy or Serina on foot.

29.     At no time after the officers' arrival on the scene did the Honda move or attempt to escape as shown by physical evidence, including the rear bumper of the Honda, the SUV's Event Data Recorder ("EDR"), and the lack of any visible skid marks by the Honda's tires.

30.     The Shooting Officers shot Jeremy and Serina almost immediately and within a matter of seconds after they exited the SUV.

31.     Jeremy Patscheck sustained at least eight (8) gunshot wounds, and he died at the scene as a result.  The most lethal of the gunshots included one bullet that perforated his skull at an angle from back-to-front, left-to-right, and upward.  In so doing, it perforated his left temple,

ruptured his left eye, and fractured the orbital ridge of the front of his skull where the bullet exited. Another bullet perforated the left side of Jeremy's neck and moved from left-to-right, downward, and slightly back-to-front. In so doing, it caused Jeremy to aspirate blood into his lungs. Yet another bullet perforated the right side of Jeremy's neck and exited through the left cheek of his face. This bullet's path was right-to-left, upward, and back-to-front. It was also associated with the aspiration of blood into Jeremy's lungs. There were other bullet wounds to his chest and back causing injuries to both of his lungs and to his liver and colon.

32. Jeremy Patscheck was 22 years old at the time of the incident and his death. He was not married and had no children or descendants.

33. Serina was also shot by the Shooting Officers—once in her upper arm and once in her back. The bullet from the gunshot to her upper back lodged in her spine and rendered her a quadriplegic. Serina required continuous long-term hospitalization following the incident and will require 24/7 professional and specialized medical, nursing, therapeutic, rehabilitative, and psychiatric and/or psychological care for the rest of her life.

34. Serina's medical expenses since the shooting have reached nearly $5,000,000.00, and her ongoing future expenses for healthcare, rehabilitation, medication, and equipment and supplies for her life-care needs are currently estimated to be approximately $43,000,000.00.

35. Serina was 23 years old at the time of the incident and the permanent, debilitating, disfiguring, and catastrophic injuries that resulted therefrom.

36. Sergeant Gardner planned, orchestrated, and ordered the high-risk tactic employed by the Shooting Officers, commonly known and referred to as a pinning and assaulting vehicle tactic ("PAV tactic").

37. Sergeant Gardner and the Shooting Officers planned to apprehend and arrest both occupants of the Honda (Jeremy and Serina) as potential co-conspirators as confirmed by their statements after the shooting.

38. Sergeant Gardner and the Shooting Officers had not been adequately trained to carry out the PAV tactic as a specialized, high-risk, stand-alone tactic that was usually reserved only for extreme situations.

39. In choosing his team of officers to deploy the tactic, Sergeant Gardner replaced a more experienced female officer with a less experienced male officer on the basis that the more experienced officer was too short to shoot into the Honda. Thus, Sergeant Gardner intended, or at least expected, the use of deadly force against the occupants of the Honda.

40. Sergeant Gardner's plan did not include de-escalation tactics or the possibility of using other non-lethal alternatives first.

41. Because of Sergeant Gardner's lack of sufficient training, he did not initiate the PAV tactic properly and thereby escalated the risks associated with carrying out the tactic.

42. Because of Officer Galluzzo's lack of adequate training in the PAV tactic, he jumped out of the SUV without taking a proper position of cover and also escalated the risks associated with the tactic.

43. Officer Galluzzo was the first officer to shoot, and he fired at least 4 shots into the front driver's side window of the Honda where Jeremy was confined and sitting.

44. At the time Officer Galluzzo shot into the Honda, he was standing immediately alongside the driver's side door and not in any position of danger of being struck by the Honda.

45.     Attached hereto as Exhibit 2 are photos of LASAR ballistic studies showing the angle and direction of at least two of the bullets fired by Officer Galluzzo into the driver's side of the Honda.

46.     Officer Schieferecke fired at least 6 shots into the passenger side windows of the Honda, including at least one shot into the front passenger side window where Serina was confined and sitting.

47.     Officer Czernicki fired at least 4 shots into the rear passenger side of the Honda, taking aim at Jeremy's head despite the fact that he was able to see a portion of Jeremy's arm.

48.     Both Officer Schieferecke and Officer Czernicki were standing on the passenger's side of the Honda and also not in any position of danger of being struck by the Honda.

49.     Attached hereto as Exhibit 3 is a scale diagram of the scene showing the relative distances between the Honda (#1), the SUV (#2), the house, garage, neighboring fence, walkways leading to the front of the house and to the back of the house through a gate.  It also shows the direction of the bullets (arrows) fired by the Shooting Officers and their approximate positions relative to the Honda at the time they fired their weapons.

50.     Sergeant Gardner, who was present at the scene immediately before and during the shooting, issued no commands and took no other action to de-escalate the situation or to stop the use of deadly force by the Shooting Officers.

51.     As alleged in greater detail below, Northglenn, by and through its Chief of Police, James S. May, Jr., ("Chief May"), failed to adequately train its officers in how and under what circumstances to safely deploy the PAV tactic, or otherwise failed to clearly promulgate,

8

disseminate, and enforce a policy against using the tactic among all levels and ranks within the Northglenn Police Department.

52. Northglenn also failed to issue policies and/or adequately train their police officers on ways to avoid or minimize the use of deadly force, de-escalate risky situations, and properly seize and arrest occupants of motor vehicles.

53. Jeremy and Serina were unarmed at the time they were shot inside the blocked, parked Honda by the Shooting Officers, and there were no firearms anywhere inside the Honda in which they were shot.

54. Because of the multiple and nearly simultaneous rounds fired by the three Shooting Officers, it is impossible to determine exactly which one(s) of these officers fired the lethal shot(s) into Jeremy and the devastating and permanently injurious shots into Serina.

55. In planning and executing this operation with deadly and catastrophic consequences, Sergeant Gardner and the Shooting Officers all engaged in a joint enterprise and conspiracy, rendering them jointly and severally liable for the injuries, damages, and losses suffered as a direct result of their actions.

## CLAIMS FOR RELIEF

### CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983

56. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

57. The Fourth Amendment of the United States Constitution prohibits unreasonable or excessive use of force in connection with searches and seizures. When restraining, detaining,

9

and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

58.    The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive protections against arbitrary abuses of executive power.    This constitutional amendment also protects the right to fundamental familial relationships and associations, including parent-child relationships.

**FIRST CLAIM FOR RELIEF**
**Violation of Fourth Amendment of United States Constitution**
**Excessive Force Resulting in Permanent Debilitating & Disfiguring Injury**
**(By Plaintiff Serina Minella against Shooting Officers and Sergeant**
**Gardner in their Individual Capacities)**

59.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

60.    A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally restrains the freedom of a person to simply walk away. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  A seizure unquestionably occurs when deadly force is used to apprehend a suspect.  *Id.*  Even an unintended person is "seized" if he or she is an object of the detention.  *Browar v. County of Inyo*, 489 U.S. 593, 596 (1989).

61.    Because law enforcement officers had been tracking the Honda and were physically stationed near the Honda where they could directly observe it and report back to other officers, Northglenn, Sergeant Gardner, and the Shooting Officers knew the Honda had another occupant besides the driver.

10

62.    At the time of the incident, Serina was "seized" for purposes of the Fourth Amendment because the Shooting Officers and Sergeant Gardner (1) were aware that the Honda had two occupants, (2) intended to arrest and take both occupants into custody, (3) physically bumped and pinned the Honda in the driveway with a large police SUV vehicle upon arriving at the scene, (4) immediately surrounded the Honda on both sides with their weapons aimed at the occupants and ready to fire, (5) purportedly issued commands to stop, don't move, and/or show hands, and (6) then the Shooting Officers actually fired at and shot the occupants inside the confines of the pinned Honda.

63.    Serina posed no threat of physical harm to Sergeant Gardner or any of the Shooting Officers or to any other person because she was seated in the front passenger seat of the Honda and thus had no control over the Honda or the ability to use the Honda as a weapon, had her back to the Shooting Officers, and had no firearm or other weapon.

64.    Serina did not exit the Honda in an attempt to flee.

65.    Given that all three of the Shooting Officers were armed, wearing protective gear, and covering each other; and given the number of back-up officers both at the scene and in the immediate area; the use of a large police SUV to physically block the Honda in the driveway; the confined position of the parked Honda relative to surrounding structures and obstacles; the surrounding space for the officers to freely move and available structures for the officers to find cover; the lack of any direct threat or attack using potentially deadly weapons or force by either Serina or Jeremy against any of the officers or any other person; the non-violent nature of the alleged underlying property offense (stolen vehicle); previously disseminated information of existing circumstances based on direct surveillance and observation of the Honda and its

11

occupants; and the presence of the GPS tracking device to allow officers to continue tracking the Honda in the event of an escape, the Shooting Officers had sufficient time to analyze the circumstances, protect themselves and others, and thus avoid violating Serina's Constitutional rights through the use of excessive and deadly gunfire force.

66.    Likewise, Sergeant Gardner, who was physically present and in command of the operation, had sufficient time to order the Shooting Officers not to shoot at the occupants, to shoot only to disable the vehicle, and/or to use their Tasers, which all of the Shooting Officers had available to use instead of their guns.

67.    Given the totality of the circumstances, no reasonable officer, including the Shooting Officers and Sergeant Gardner, could reasonably perceive any risk or threat of immediate harm to themselves or others at the time they fired multiple rounds of gunfire at the occupants of the Honda.  *See* Exhibits 1, 2 & 3.

68.    In particular, the Shooting Officers and Sergeant Gardner had no reasonable basis to perceive any threat whatsoever from Serina who was merely sitting in the front passenger seat of the Honda.

69.    The Shooting Officers, however, failed and/or refused to analyze the situation to de-escalate it, and then, almost immediately upon arrival, purposefully fired multiple rounds of gunshots at the occupants, including Serina, who were in the enclosed and already pinned Honda.

70.    Sergeant Gardner, who planned the operation and use of the PAV tactic; who supervised, selected, and/or otherwise directed the team comprised of the Shooting Officers; who knew the nature of the alleged property crime and the existing circumstances before arriving at

12

the scene, specifically including the fact that there were two occupants in the parked Honda; who drove the Shooting Officers to the scene; who physically bumped and blocked the Honda with the SUV he was driving; who could see the surrounding buildings and obstacles that further blocked or impeded the Honda from escaping; and who knew that other back-up officers were present, did nothing to stop and thus purposefully allowed or even encouraged the use of multiple rounds of gunfire by the Shooting Officers against both occupants of the Honda.

71. The acts and omissions of Sergeant Gardner and the Shooting Officers all combined to unnecessarily escalate the situation and risks associated with the PAV tactic, which led to the unnecessary use of excessive force.

72. Sergeant Gardner had inadequate training in determining when and if to use the PAV tactic and how to properly and safely carry it out; and he failed to report that fact to his superiors and to the involved Shooting Officers.

73. Likewise, none of the Shooting Officers were adequately trained in when, if, and how to properly and safely carry out the PAV tactic; and all three of them failed to inform Sergeant Gardner of that important fact when he selected and/or ordered them to carry it out.

74. Sergeant Gardner's plan contained no alternatives for the Shooting Officers to try to de-escalate the situation or use non-lethal alternatives first, and/or to take appropriate positions of cover to minimize the risks associated with the PAV tactic.

75. As a result of the lack of adequate training and poor planning, Officer Galluzzo failed to take proper cover when he exited the SUV, which elevated the overall risk, uncertainty, and tension of the situation for the other two Shooting Officers.

13

76.    The lack of adequate training, lack of non-lethal alternatives, lack of de-escalation techniques, and poor planning also contributed to the immediate reaction of nearly simultaneous back-up gunfire by Officers Czernicki and Schieferecke when Officer Galluzzo started shooting first.

77.    As a result of the Shooting Officers' unconstitutional use of excessive, unreasonable, and unnecessary force, and Sergeant Gardner's failure to stop or prevent such use of force, Serina suffered catastrophic injuries, damages, and losses, including without limitation, a bullet lodged in her spinal cord, permanent quadriplegia, permanent impairment, permanent disfigurement, extensive past and future medical and rehabilitation expenses and life-care expenses that will be required for the rest of her life, loss of income and ability to earn an income for herself for the rest of her life, loss of ability to procreate and raise a family, loss of enjoyment of life, extreme emotional distress, and mental and physical pain and suffering.

## SECOND CLAIM FOR RELIEF
**Violation of Fourteenth Amendment of United States Constitution
Deprivation of Due Process Rights Resulting in Injury to Life and Loss of Liberty
(By Plaintiff Serina Minella against Shooting Officers and Sergeant Gardner in their
Individual Capacities)**

78.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

79.    Alternatively, the Shooting Officers deprived Serina of her Fourteenth Amendment due process right to life and liberty by purposefully firing multiple rounds of bullets from both sides of the Honda at Jeremy and Serina who were confined within the parked and physically pinned Honda.

80.     The Shooting Officers aimed their weapons at the heads and/or upper bodies of the occupants and fired their weapons almost immediately upon exiting the SUV into the enclosed, pinned Honda with the intention of causing, or with deliberate indifference to the possibility that doing so would likely cause, serious bodily injury or death to the occupants.

81.     In addition, Sergeant Gardner deprived Serina of her Fourteenth Amendment due process right to life and liberty by planning and orchestrating the highly risky PAV tactic that was either prohibited by Northglenn policy or for which he had inadequate experience and training with the specific intention that the officers involved be able to fire their guns at the occupants inside the Honda.

82.     Sergeant Gardner purposefully selected a less experienced and taller male officer over a more experienced and shorter female officer so that all the officers involved would more easily be able to shoot down at the occupants inside the Honda.

83.     Once on the scene and despite the existence of multiple circumstances militating against the use of deadly force, Sergeant Gardner failed to take any action to stop or prevent the use of such force, thereby intending and encouraging the Shooting Officers to use deadly gunfire against the occupants of the Honda.

84.     As a result of the conduct of the Shooting Officers and Sergeant Gardner, Serina suffered catastrophic injuries, damages, and losses, including without limitation, a bullet lodged in her spinal cord, permanent quadriplegia, permanent impairment, permanent disfigurement, extensive past and future medical and rehabilitation expenses that will be required for the rest of her life, extensive past and future life-care expenses that will be required for the rest of her life, loss of income and ability to earn an income for herself for the rest of her life, loss of ability to

procreate and raise a family, extreme emotional distress, and mental and physical pain and suffering.

85.    The firing of multiple gun shots by the Shooting Officers from both sides of the Honda at the occupants confined inside, the bullet holes and ballistic evidence of shots fired into the passenger side of the Honda, and the purposeful planning of the attack, despite lack of adequate training and lack of de-escalation and non-lethal alternatives, represent conscious-shocking, intentional, and/or deliberately indifferent conduct directed at Serina in violation of her rights to life and liberty guaranteed under the U.S. Constitution.

### THIRD CLAIM FOR RELIEF
**Violation of Fourteenth Amendment of United States Constitution**
**Deprivation of Familial Association**
**(By Plaintiffs Shelton and Patscheck as Parents of Jeremy Patscheck against Sergeant Gardner and the Shooting Officers in their Individual Capacities)**

86.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

87.    Plaintiffs Shelton and David Patscheck, as the parents of Jeremy, have a constitutionally protected liberty interest in the familial relationship and association with their son through the Fourteenth Amendments to the United States Constitution.

88.    Sergeant Gardner and the Shooting Officers violated the Shelton and Patscheck Plaintiffs' constitutional rights by planning and carrying out the plan to use deadly force against Jeremy.

89.    As previously alleged, Sergeant Gardner planned and orchestrated the highly risky PAV tactic that was either prohibited by Northglenn policy or for which he had inadequate

16

experience and training with the specific intention that the officers involved be able to fire their guns at the occupants inside the Honda.

90.    At the time of the incident, the Shooting Officers exited the police SUV, driven by Sergeant Gardner, with their firearms raised and ready to fire.

91.    Once on the scene and despite the existence of multiple circumstances militating against the use of deadly force, Sergeant Gardner failed to take any action to stop or prevent the use of such force, thereby intending and encouraging the Shooting Officers to use deadly gunfire against the occupants of the Honda.

92.    Almost immediately upon exiting the SUV that Sergeant Gardner used to pin and block the parked Honda in which Jeremy and Serina were sitting, the Shooting Officers—one on the driver's side of the Honda and two on the passenger's side—purposefully fired multiple gun shots into the enclosed vehicle and at the occupants pursuant to Sergeant Gardner's orders and planned tactic.

93.    Based on ballistic evidence and the coroner's examination, Officer Galluzzo fired the first shot or shots at Jeremy's head and upper body from relatively close range while standing at the front driver's side window of the Honda.  *See* Exhibit 2.

94.    Officers Schieferecke and Czernicki then immediately reacted by firing multiple rounds at the occupants of the Honda.

95.    Officer Czernicki aimed at Jeremy's head before firing four rounds at him.

96.    In so doing, the Shooting Officers shot at Jeremy with the intention of killing him or with deliberate indifference that aiming and shooting at his head and upper body would result in his death.

17

97. Sergeant Gardner did not order and the Shooting Officers did not use any de-escalation techniques or non-lethal alternatives against Jeremy or otherwise shoot to incapacitate rather than kill him.

98. By devising and carrying out a plan to shoot and kill Jeremy, Sergeant Gardner and the Shooting Officers necessarily intended or acted with deliberate indifference to deprive anyone who had an intimate and/or familial relationship with Jeremy, specifically including Jeremy's parents, of their constitutional rights in continuing their familial relationship and association with Jeremy.

99. As a result of the intentional, purposeful, and deliberately indifferent conduct of Sergeant Gardner and the Shooting Officers, Jeremy died at the scene; Plaintiffs Shelton and Patscheck were deprived of their constitutional right to the continued familial relationship and association with Jeremy; and they have suffered damages and losses, including without limitation, pain, suffering, emotional distress, and extreme grief associated with the death and permanent loss of their son.

100. The previously alleged facts and circumstances surrounding and leading to the intentional killing of Jeremy represent conscious-shocking, intentional, and/or deliberately indifferent conduct in violation of the constitutional rights of Jeremy's parents to their familial association with their son.

**FOURTH CLAIM FOR RELIEF**
**Violation of Fourth Amendment of the United States Constitution**
**Excessive Force Resulting in Death of Jeremy Patscheck**
**(By Plaintiff Shelton as Personal Representative of the Estate of Jeremy Patscheck and by Plaintiffs Shelton and Patscheck, individually, as parents of Jeremy Patscheck, against Sergeant Gardner and the Shooting Officers in their Individual Capacities)**

101. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

102. At the time of the incident, Jeremy was "seized" for purposes of the Fourth Amendment because the Shooting Officers and Sergeant Gardner (1) were aware that the Honda had two occupants, (2) intended to arrest and take both occupants into custody, (3) physically bumped and pinned the Honda in the driveway with a large police SUV vehicle upon arriving at the scene, (4) immediately surrounded the Honda on both sides with their weapons armed and ready to fire, (5) purportedly issued commands to stop, don't move, and/or show hands, and (6) then the Shooting Officers actually fired at and shot the occupants inside the confines of the pinned Honda.

103. Because of the narrowness of the driveway in which the Honda was parked, the proximity of the police SUV immediately behind it, the house immediately to the left of it, the garage in front of it, a neighboring fence to the right of it, and the presence of other back-up police officers in the immediate vicinity, it would have been extremely unlikely, if not impossible, for Jeremy to have turned the Honda around in order to escape or use it offensively.

104. Because of the space and distances around the Honda and the position of the Shooting Officers along the sides of the Honda (as opposed to being directly in front or behind it), there was no objectively reasonable fear that Jeremy could use the Honda to imminently harm any of the Shooting Officers.

105. Jeremy did not use the Honda as a means of escape, and it remained at all times in the confines of the house's upper driveway, blocked by the house, its garage, the neighboring fence, and the Northglenn SUV.

19

106.    Jeremy also did not exit the Honda in an attempt to assault the officers or flee.

107.    Jeremy had no firearm and thus did not threaten the Shooting Officers with any such weapon.

108.    Given that all three of the Shooting Officers were armed, wearing protective gear, and covering each other; and given the number of additional back-up officers both at the scene and in the immediate area; the use of a large police SUV to physically block the Honda in the driveway; the confined position of the parked Honda relative to surrounding structures and obstacles; the surrounding space for the officers to freely move and available structures for the officers to find cover; the lack of any direct threat or attack using potentially deadly weapons or force by either Serina or Jeremy against any of the officers or any other person; the non-violent nature of the alleged underlying property offense (stolen vehicle); previously disseminated information of existing circumstances based on direct surveillance and observation of the Honda and its occupants; and the presence of the GPS tracking device to allow officers to continue tracking the Honda in the event of an escape, the Shooting Officers had more than sufficient time to analyze the circumstances, protect themselves and others, and thus avoid violating Jeremy's Constitutional rights through the use of excessive and deadly gunfire force.

109.    Likewise, Sergeant Gardner, who was physically present and in command of the operation, had sufficient time to order the other Shooting Officers not to shoot at the occupants, to shoot only to disable the vehicle, and/or to use their Tasers, which all of the Shooting Officers had available to use instead of their guns.

110.    Given the totality of the circumstances, no reasonable officer, including the Shooting Officers and Sergeant Gardner, could reasonably perceive any risk or threat of

20

immediate harm to themselves or others at the time they fired multiple rounds of gunfire at the occupants of the Honda. *See* Exhibits 1, 2 & 3.

111.    The Shooting Officers, however, failed and/or refused to analyze the situation in an effort to de-escalate it, and then, almost immediately upon arrival, purposefully fired multiple rounds of gunshots at the occupants, including Jeremy, who were in the enclosed and already pinned and immobilized Honda.

112.    Sergeant Gardner, who was present and knowledgeable of the surrounding circumstances, did nothing to stop and thus purposefully allowed or even encouraged the use of multiple rounds of gunfire by the Shooting Officers against both occupants of the Honda.

113.    The acts and omissions of Sergeant Gardner and the Shooting Officers all combined to unnecessarily escalate the situation and risks associated with the PAV tactic, which led to the unnecessary use of excessive force.

114.    Sergeant Gardner had inadequate training in determining when and if to use the PAV tactic and how to properly and safely carry it out; and he failed to report that fact to his superiors and to the involved Shooting Officers.

115.    Likewise, none of the Shooting Officers were adequately trained in when, if, and how to properly and safely carry out the PAV tactic; and all three of them failed to inform Sergeant Gardner of that important fact when he selected and/or ordered them to carry it out.

116.    Sergeant Gardner's plan contained no alternatives for the Shooting Officers to try to de-escalate the situation or use non-lethal alternatives first, and/or to take appropriate positions of safety and cover for themselves.

117. As a result of the lack of training and poor planning, Officer Galluzzo failed to take proper cover when he exited the SUV, which then elevated the overall risk, uncertainty, and tension of the situation for the other two Shooting Officers.

118. As a result of the Shooting Officers' unconstitutional use of excessive, unreasonable, and deadly force, and Sergeant Gardner's failure to stop or prevent such use of force, Jeremy suffered multiple fatal gunshot wounds to his head, neck, and upper body, and he died at the scene.

119. According to certain officers' reports, Jeremy did not die immediately and may have been able to open the door of the Honda and/or even try to exit it before collapsing on the driveway.

120. According to the coroner's report, the cause of Jeremy's death was aspiration of blood into his lungs caused by one or more of the gunshot wounds inflicted by the Shooting Officers. Thus, Jeremy unnecessarily suffered as his lungs filled up with his own blood and died by choking and asphyxiation.

121. The Shooting Officers' unconstitutional use of excessive, unreasonable, and deadly force resulted in damages in the nature of Jeremy's pain and suffering before death, funeral and burial or cremation expenses, loss of future earnings, loss of Jeremy's consortium to his parents and immediate family members, and extreme pain, suffering, grief, emotional distress, and loss of companionship to his parents and immediate family members for his permanent loss.

## FIFTH CLAIM FOR RELIEF
### Failure to Properly Train and/or Policy or Custom of Violating Constitutional Rights
(All Plaintiffs against the City of Northglenn)

122.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

123.    Northglenn, through its Chief of Police, Chief May, had ultimate decision-making and policy-making power for the Northglenn Police Department and its officers.

124.    Before the incident, there was a draft policy regarding the deployment of the specialized, high-risk PAV tactic that had not been approved by Chief May.

125.    The PAV tactic was considered high-risk because it is considered extremely dangerous to the officers involved, the suspect(s), and the public at large.

126.    The PAV tactic was also considered a rarely used, highly specialized tactic to only be used in extreme circumstances because of the level of danger involved.

127.    The PAV tactic is never appropriate for responding to property crimes.

128.    Chief May did not approve the draft PAV tactic policy for inclusion in Northglenn's policy manual because he purportedly planned to prohibit the deployment of the tactic.

129.    Chief May and/or his commanding officers at Northglenn failed to issue a clear policy one way or the other about deploying the PAV tactic to all Northglenn police officers.

130.    Thus, at the time of the incident, there was confusion and uncertainty among the ranks of Northglenn officers as to whether the PAV tactic was permitted, allowable only under extreme circumstances, or prohibited in general because of the lack of a policy one way or the other that addressed how, when, or if to deploy the tactic.

23

131.    The uncertainty and confusion surrounding the deployment of the PAV tactic was furthered by the fact that Northglenn officers received training in what a PAV tactic looks like in connection with more generalized training for dealing with suspects in motor vehicles.

132.    However, Northglenn failed to provide training on the high-risk PAV tactic as a stand-alone tactic or operation, and thus failed to provide any guidance, much less training, as to how, when, if, or under what circumstances the tactic should be deployed.

133.    Thus, at the time of the incident, the Northglenn patrol sergeants, including Sergeant Gardner, and the Shooting Officers lacked adequate training and guidance concerning the deployment of the PAV tactic.

134.    Northglenn exonerated all three of the Shooting Officers and Sergeant Gardner for their attempts to deploy the purportedly prohibited PAV tactic because the purported directive prohibiting the tactic had not been disseminated to them.

135.    Northglenn also had the following written policy that its officers should not fire shots at a moving motor vehicle:

> SHOOTING AT OR FROM MOVING VEHICLES
>
> Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.
>
> Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

136.    The Shooting Officers have claimed that the Honda was moving just before or during the shooting.

137.    If it was moving, then the Shooting Officers violated the above-quoted written policy.

138.    Even if the Honda moved, it only moved, at most, within the confined area of the blocked driveway.

139.    There was no objectively reasonable threat of imminent harm by the Honda itself because the Shooting Officers were positioned at the sides of the Honda and not directly behind or in front of it when they opened fire.

140.    Because the Honda was blocked by the SUV directly behind it, the house to the left of it, the garage in front of it, and the neighboring fence to the right of it, Jeremy was not able  to escape or use the Honda offensively.

141.    Because there was ample distance and open space for the Shooting Officers to move around and multiple places and structures to take cover, the Shooting Officers had unlimited options for getting out of the Honda's way as the above policy requires.  *See* Exhibits 1 & 3.

142.    The Shooting Officers opened fire on the occupants of the Honda almost immediately, within a matter of seconds after they exited the SUV.

143.    Neither Jeremy nor Serina was armed with any kind of weapon that they could have used against or threatened the Shooting Officers or any other person; thus there was no basis for the Shooting Officers to perceive that they or anyone else was being threatened by any weapon from the Honda.

25

144.    The Shooting Officers opened fire without there being any kind of vehicle chase and long before they had any basis to perceive an imminent threat of harm to themselves or others by either Jeremy or Serina.

145.    Sergeant Gardner and the Shooting Officers failed to take any action to de-escalate the situation and to try using non-lethal tactics to arrest Jeremy and Serina.

146.    Despite these facts and circumstances, Northglenn exonerated all three of the Shooting Officers on the question of whether they violated the policy against shooting at a moving vehicle.

147.    Northglenn also trained its officers or otherwise promoted a policy or custom of using gunfire to kill or destroy the targets rather than shooting to disable a suspect.

148.    However, Northglenn failed to adequately train its officers to use de-escalation tactics and to use non-lethal alternatives whenever possible and instead of lethal gunfire.

149.    This training, policy, or custom to shoot to kill before using de-escalation tactics or non-lethal alternatives is exemplified by Officer Czernicki's statement that although he could see both Jeremy's head and a portion of the side of his arm, he aimed at Jeremy's head when he fired four gunshots at him.

150.    If the Honda was not moving when the Shooting Officers fired their weapons at the occupants, then there were no exigent circumstances to warrant the use of such force (no dangerous fleeing vehicle and no weapons being used or threatened against the officers or anyone else).

151.    Furthermore, the above-quoted policy against shooting at moving vehicles includes a prohibition against shooting to disable such vehicles.

152.    However, if the Honda was not moving when the Shooting Officers fired their weapons at the occupants, or if they had legitimate concerns about a potential risk of escape and/or offensive use of the Honda against any of the officers, then they could have simply fired their weapons at the tires of the Honda to disable it.

153.    The fact that not one of the Shooting Officers made an effort to disable the vehicle before resorting to the immediate use of deadly force indicates a lack of adequate training regarding the implementation and nuances of the policy against shooting at moving vehicles and/or training to use de-escalation tactics and non-lethal alternatives if at all possible before resorting to deadly force.

154.    There are other instances and cases indicating that Northglenn fosters an unwritten policy, custom, culture, or environment that condones, contributes to, or is deliberately indifferent to the use of excessive force by its officers in circumstances where the suspect did not pose an immediate threat to the officers or others.

155.    The Plaintiffs' counsel in this case represented the plaintiff in *Jesperson v. Magness et al.*, Case No. 16-cv-00415-NYW (D.Colo. 2016), in a matter against three Northglenn police officers who were accused of using excessive and unnecessary force in the course of arresting and transporting Mr. Jesperson, who was merely intoxicated in front of his home and unarmed.

156.    In 2018, a Northglenn police officer shot and killed Brandon Vieweg as he attempted to flee from police after exiting a motor vehicle.

157.    In 2017, Northglenn police officers shot into a vehicle that was slowly moving in a parking lot and killed Hector Navarrete.

27

158.    In *Estate of Strong v. City of Northglenn*, Case No. 17-cv-01276-WJM-SKC (D.Colo. 2017), Northglenn and three of its officers were accused and sued for using excessive and deadly force in the course of making an unannounced, no-knock search warrant of a home while the family was sleeping, resulting in over 20 gunshots to Mr. Strong, one or more of which were made at very close range, and that pulpified the wounded areas of his body and obscured the path of many bullets.

159.    In *Rojas v. Anderson et al.*, Case No. 11-cv-01200-DME-KLM (D.Colo. 2011), Northglenn and three of its police officers were accused of and sued for using excessive force in the course of arresting and transporting Oliver Rojas who was unarmed, intoxicated, and in front of his home at the time.

160.    Even Sergeant Gardner himself has a history of excessive force incidents:

a.    May 2010 – oversaw the use of excessive force by subordinates while arresting a juvenile for underage drinking; then slapped the suspect as he escorted him to the police vehicle; failed to cure inaccuracies in the reports of the incidents by the subordinates; and failed to recognize and control the use of unauthorized and inappropriate physical force against the arrestee; and

b.    March 2010 – made inappropriate findings of no violations in a subordinate's report on the use of force in arresting a tenant in connection with a loud music complaint.

161.    In addition, Sergeant Gardner has a history of other incidents reflecting poorly on his temperament and respect for the law, even as a law enforcement officer:

a. July 2009 – directed a subordinate officer to destroy marijuana evidence found at the scene of a homicide;

b. July 2008 – received a citizen's complaint for losing his patience and being rude and offensive to the citizen; and

c. July 2006 – allowed and facilitated the consumption of alcohol by an underage female police volunteer during a party hosted at his home.

162. Despite these past instances of inappropriate and/or illegal conduct, Sergeant Gardner was a supervising sergeant for Northglenn at the time of the incident and the one who planned, orchestrated, and ordered the deployment of a purportedly prohibited PAV tactic for which he and his subordinate Shooting Officers also lacked sufficient training and guidance.

163. Despite the happening of the incident itself, it is unclear whether Sergeant Gardner received any appropriate discipline for his role in its occurrence.

164. All of these factors and conditions combined to create a policy, custom, culture and/or environment within Northglenn that was deliberately indifferent to, facilitated, promoted, or even condoned the use of excessive force by its officers in the regular course of contacting, apprehending, and arresting suspects in the Northglenn community.

165. As a direct and proximate result of Northglenn's policies, customs, police practices, and lack of training and communication among its officers which led to a deliberately indifferent culture of regularly using excessive force without meaningful consequence:

a. Sergeant Gardner planned and ordered the deployment of a purportedly prohibited high-risk PAV tactic for which he and his subordinate Shooting Officers lacked

sufficient training and guidance and which failed to include de-escalation and non-lethal alternatives;

b. Sergeant Gardner's ill-conceived and poorly executed PAV tactic unnecessarily escalated the risk of an already high-risk tactical maneuver;

c. Because they had no plan for de-escalating the risk or using non-lethal alternatives to arrest Jeremy and Serina, the three Shooting Officers immediately resorted to simultaneously firing multiple rounds of gunshots into the pinned Honda by aiming at the two occupants' heads and upper bodies;

d. The outcome was the unnecessary death of Jeremy and the unnecessary and catastrophic permanent quadriplegia of Serina, both of whom were unarmed, as previously alleged.

## SIXTH CLAIM FOR RELIEF
### Punitive Damages for Violation of Constitutional Rights under 42 U.S.C. §1983
### (By All Plaintiffs against Sergeant Gardner and the Shooting Officers in their Individual Capacities)

166.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

167.    Sergeant Gardner planned, ordered, and directly witnessed and supervised the PAV tactic that the Shooting Officers used against Jeremy and Serina at the time of the shooting, knowing that he was not sufficiently trained in how to properly deploy the tactic, that the tactic was extremely dangerous and risky, and/or that the tactic was inappropriate for the circumstances and the alleged property offense involved.

30

168.    Sergeant Gardner purposefully replaced a more experienced female officer with a less experienced male officer because of the female officer's lower stature and concerns that she would not be able to shoot her gun down into the Honda and at its occupants.

169.    Sergeant Gardner purposefully failed to include plans for de-escalating the situation and/or using non-lethal alternatives.

170.    Sergeant Gardner purposefully failed to take action at the scene to de-escalate the situation or otherwise order the Shooting Officers to hold their gunfire.

171.    The Shooting Officers intentionally aimed and fired their guns at the heads and upper bodies of Jeremy and Serina who were at all times inside the enclosed and pinned Honda.

172.    The Shooting Officers fired almost immediately upon exiting the SUV despite wearing protective gear, having the cover of the other Shooting Officers and Sergeant Gardner, and multiple back-up officers in the area, and despite having the time and ability to fully assess the situation before resorting to multiple rounds of deadly gunfire force.

173.    The Shooting Officers intended to use deadly force against both Jeremy and Serina to prevent them from trying to escape.

174.    Furthermore, by aiming and firing their guns at the heads and upper bodies of the Honda's occupants, the Shooting Officers acted with deliberate, reckless, and/or callous indifference toward the constitutional rights and likelihood of serious injury or death to both Jeremy and Serina.

175.    Sergeant Gardner and the Shooting Officers have recounted their versions of the events and circumstances of the incident in ways that are self-serving, inconsistent, and

31

conflicting with each other's versions and contrary to physical and observable conditions and evidence at the scene of the incident.

176.    Sergeant Gardner and the Shooting Officers have expressed no remorse in hindsight and have indicated that they would take the same actions that ended Jeremy's life at only 22 years and that rendered Serina a complete quadriplegic at the age of 23 for the rest of her life.

177.    Accordingly, Sergeant Gardner and the Shooting Officers should be required to pay the Plaintiffs additional damages, over and above any actual and compensatory damages, to punish them for their evil intent, willful and wanton conduct, and/or for acting with deliberate, reckless, and/or callous indifference toward the Plaintiffs' constitutional rights, and to deter other law enforcement officers from engaging in such conduct in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs on their respective claims and against the Defendants, jointly and/or severally, as follows:

(a)    compensatory damages in an amount that will fully and fairly compensate the Plaintiffs for their respective injuries, damages, and losses, pursuant to 42 U.S.C. §1983;

(b)    punitive damages pursuant to federal law as punishment and deterrence against the commission of future such conduct;

(c)    pre- and post-judgment interest;

(d)    reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable federal or state law; and

(e)    any other relief the Court deems proper and just.

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 22nd day of November, 2019.

BEEM & ISLEY, P.C.

s/Clifford L. Beem
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 - 17th Street, Suite 850
Denver, Colorado  80202
Ph:    303.894.8100
Fax:    303.894.8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net


BAUMGARTNER LAW, L.L.C.

s/S. Birk Baumgartner
S. Birk Baumgartner
300 E. Hampden Ave., Suite 4041
Englewood, Colorado 80113
Ph.:    720.626.9418
Fax:    720.634.1018
birk@baumlawco.com

*Counsel for Plaintiffs*

Plaintiffs' Addresses:

Serina Minella
c/o Kevin McNerny
8443 Everett Way, Unit C
Arvada, Colorado  80005

Melanie Shelton
1765 Opal Avenue
Lochbuie, Colorado 80603

David Patscheck
6615 Newland Street
Arvada, Colorado 80003